Nott, Oh. J.,
delivered the opinion of the court:
The controversy in this case springs out of a few words in the following statutory provisions, viz:
“Chapter 874. — AN ACT making appropriations for the service of tliePost-Oifice Department for the fiscal year ending June thirtieth, eighteen hundred and ninety.
“Be it enacted, etc., (1) That the following sums be, and they are hereby, appropriated for the service of the Post-Office Department, in conformity with the act of July second, eighteen hundred and thirty-six, as follows:
“For compensation to clerks in post-offices, six millions five hundred and fifty thousand dollars; and that the Postmaster-General be, and is hereby, authorized to classify and fix the salaries of the clerks and employees attached to the first-class post-offices from and after July first, eighteen hundred and eighty-nine, as hereinafter provided: Provided, hoioever, That *417 the aggregate salaries as fixed by such classification shall not exceed the sum hereby appropriated, namely:”
(Then follow paragraphs mentioning the percentages upon the salaries of their respective postmasters which the following classes of post-cffice employees shall receive: Assistant postmasters, secretaries and stenographers to the postmaster, cashiers, assistant cashiers, finance clerks, stamp clerks, stamp agents, superintendents of mails, assistant superintendents of mails, and a large number of others ; and then the paragraph which relates to superintendents of delivery.)
“Superintendents of delivery, salary not exceeding forty-five per centum per annum of the salary of the postmaster, as provided by the act of March third, eighteen hundred and eighty-three, graded in even hundreds of dollars from one thousand three hundred dollars to not exceeding two thousand seven hundred dollars per annum, except at New York, New York, where the salary of the superintendent of delivery shall be fixed at three thousand dollars per annum.” (25 Stat. L., p. 841.)
The Act 3d March, 1883 (22 Stat. L.,-600), above referred to, is the “ act to adjust the salaries of postmasters.” It subdivides post-offices of the first class into thirteen subclasses. In the smallest, where the gross receipts are between 140,000 and $45,000, the salary is fixed at $3,000; -in the largest, where the gross receipts amount to $600,000 and upward, the salary is fixed at $6,000. The New York and Washington post-offices are distinct subclasses, the salaries being permanently fixed at $8,000 and $5,000, respectively.
The act of 1889 provides for each superintendent of delivery a “salary not exceeding 45 per cent per annum of the salary of the postmaster, as provided lay the act of March 3,1883, graded in even hundreds of dollars.” Forty-five per cent of $3,000 (the smallest salary of a postmaster) “in even hundreds” will be $1,300; 45 per cent of $6,000 (the largest salary) will be $2,700. Therefore, at the first reading of this statutory clause there seems to be no reason for the additional words “from one thousand three hundred dollars to not exceeding two thousand seven hundred dollars per annum.” The practical application of the statute to the maximum salaries of superintendents of delivery at “not exceeding 45 per cent per annum of the salary of the postmaster, as provided by the act *418 of March. 3,1883, graded in even hundreds,” will be seen in the following table:
Postmaster’s salary, $3,000; superintendent’s, $1,300.
Postmaster’s salary, $3,100; superintendent’s, $1,300.
Postmaster’s salary, $3,200; superintendent’s, $1,400.
Postmaster’s salary, $3,300; superintendent’s, $1,400.
Postmaster’s salary, $3,400; superintendent’s, $1,500.
Postmaster’s salary, $3,500; superintendent’s, $1,500.
Postmaster’s salary, $3,600; superintendent’s, $1,600.
Postmaster’s salary, $3,700; superintendent’s, $1,600.
Postmaster’s salary, $3,800; superintendent’s, $1,700.
Postmaster’s salary, $3,900; superintendent’s, $1,700.
Postmaster’s salary, $4,000; superintendent’s, $1,800.
Postmaster’s salary, $5,000; superintendent’s, $2,250.
Postmaster’s salary, $6,000; superintendent’s, $2,700.
The postmasters’ salaries are fixed by law and admit of no discretion on the part of the Postmaster-General; the superintendents’ salaries are limited by law, and that limitation is 45 per cent of the fixed salary of the postmasters, respectively. The Postmaster-General being limited in the exercise of his discretion to a maximum, is he also limited to a minimum?
The statute answers this inquiry by the accompanying words, “from one thousand three hundred dollars to not exceeding two thousand seven hundred dollars.” It was within the discretion of the Postmaster-General to fix the compensation of all superintendents in the above table at less than 45 per cent of the postmasters’ salaries; it was not within his discretion to fix the compensation of any one of them at less than “ one thousand three hundred dollars.” In other words, he had discretion to make all thé amounts in the second column $1,300; he had not discretion to make any one of them more than 45 per. cent of the postmaster’s salary. The intent was twofold— to prevent exceptionally high salaries in some offices and arbitrarily low salaries in other offices. Previous legislation had allowed Postmasters-General to do what they pleased with an appropriation for clerks; this act was to restrict that discretion, both.above and below, in maximum and minimum. It was a rational purpose on the part of Congress, a commendable one, tending to the security and consequent elevation of the civil service. Whether clerks performing identical service in different places should be paid different salaries was a question of a general nature, which might well engage the attention of Congress. The statute answers the question by approximating to uniformity — by declaring in effect that the salaries, *419 say, of these superintendents, shall not be more than $3,000 in New York, nor more than $2,700 in Philadelphia, nor less than $1,300 in Augusta.
It has been urged by the defense that the general proviso in the appropriation act of 1889, “ that the aggregate salaries as fixed by such classification shall not exceed the sum hereby appropriated, namely, $6,550,000,” was a general limitation upon the action of the Postmaster-General and upon the classification itself. The court is not informed as to the particulars of the manner in which the classification has been carried out generally. In his annual report for the same year, 1889, the Postmaster-General said: “The law required the classification to take effect July 1, and while'it raised the salaries of the lower grades, it failed to make adequate appropriation for the same, in consequences of which the salaries of many of the officials of the higher grades had to be reduced to the minimum sum named, when faithfulness and training called for an increase to the maximum.” In the report for 1890 it is said: “The maximum salaries for certain lines of clerical service are not large enough at present to command the highest order of clerical ability, arid the law should be amended in this respect.”
Not until the Postmaster-GeneraLhad reduced every officer in the classified service to the minimum salary could the gen eral proviso be deemed to authorize him to place any one officer on a salary below the minimum; and not until that fact is established can the court infer that the amount appropriated was insufficient to carry out the purposes of the act. The burden of proof rests upon the defendants. It is within their power to show that the Postmaster-General allowed nothing-above minimum salaries and that the appropriation was then insufficient to pay minimum salaries to all. That fact is a matter of defense, and it is one which the claimant manifestly can not prove, and therefore should not be called upon to prove. The annual reports above cited imply very clearly that the Postmaster-General did not reduce all of the officers of the classified service to minimum salaries. Moreover, the court has given defendants especial opportunity to establish that fact by remanding the case after hearing it, and calling upon the Postmaster-General for further information. The Postmaster-General has not responded to the call, and the defendants have *420 offered no proof to establish, the fact. It must therefore be assumed and inferred and taken to be and treated as a fact established that the Postmaster-General did not reduce all salaries to the minimum, and that if he had done so the appropriation would have been sufficient to give to every official his statutory compensation. Congress manifestly believed that they were appropriating money enough to give full effect to the act, and there is nothing shown in this case to justify the court in saying that Congress were mistaken. Not until the legislative mistake is established will the court be justified in entertaining the question whether the provisions of the statute must necessarily fail.
If it were shown in the case that the $6,550,000 appropriated was insufficient to pay all and only minimum salaries, it would not follow that every public officer in the classified service would necessarily be without redress. A departmental officer charged with the administration of a statute is intrusted with the power of carrying out, its provisions, and not with a kind of veto power to nullify them. The extremest limit to which such an officer can go is well defined by the recent case of Dunlop v. The United States (7113 U. S. B., 65; 33 C. Cls. B., 135), where the Supreme Court, by a bare majority of its members, held that the act must fail in practical effect because the Secretary of the Treasury had not prescribed the regulations by which the claimant’s rights could be determined. This case now before us would be analogous to the Dunlop Case if the Postmaster-General had failed or declined to classify the service. If he had appointed nobody as superintendent of delivery in any post-office, there would be no. superintendent of delivery seeking redress.
But it is impossible that Congress intended that every clerk or any clerk in the service of the Government should be held responsible for the manner in which the head of an Executive Department disburses a general appropriation. In the Ourtis Case (4 C. Cls. B., 144) it was held that where a contractor was the sole contractor to do the work under an act which expressly limited the expenditure to the amount appropriated he was chargeable with notice and could not recover for anything in excess. But in many cases it has been held that where a public work is authorized, and an appropriation made therefor, and a number of contractors are employed, none is chargeable *421 with knowledge as to the condition of the fund. The rule was well formulated by Mr. Justice Davis in the case of Dougherty v. United States (18 C. Cls. B., 496, 503):
‘‘When one contract on its face assumes to provide for the execution of all the work authorized by an appropriation the contractor is bound to know the amount of the appropriation and can not recover beyond it; but we have never held that persons contracting with the Government for partial service under general appropriations are bound'to know the condition of the appropriation account at the Treasury.”
The same principle has been applied to public officers. In. one of the earliest cases in this court — Graham's Oase (1 C. Cls. B., 380) — it was held that “an employee of the Government is entitled to the salary allowed by law and is not limited by the amount appropriated.” In Collins's Case (15 id., 22) it was held that “ the compensation,of public officers depends upon general laws, irrespective of the annual appropriation acts.” In Langston v. The United States (118 U. S. B., 389) the Supreme Court held that “a statute which fixes the annual salary of a public officer at a designated sum without limitation as to time is not abrogated or suspended by subsequent enactments appropriating a less amount for his services for a particular fiscal year.”
The limitation which we are considering, that the aggregate salaries to be fixed by the Postmaster-General should not exceed $6,550,000, was the annual appropriation for a particular fiscal year. It is plain that Congress supposed they were appropriating money enough for the purposes of the new classification, and that this limitation applied to the Postmaster-General as distinguished from his subordinates, and that it was intended to limit him with regard to the maximum salaries which he might allow. As the case now stands it is simply a question whether the Postmaster-General in his discretion could take one officer’s money and pay it to another; whether he could put the compensation of some superintendents of delivery below the minimum in order that he might put some other superintendents’ compensation at the maximum. To that question there can be but one answer: The statute gave to him no such discretion.
But the case presents still another question. It appears by the evidence that the claimant performed the duties of a super *422 intendent of delivery during the entire period of service for which the suit is brought. But it also appears by the records of the Department that he was not designated as superintendent of delivery for more than two of those years. The record of the Department — that is to say, the record of his appointment — must govern both for the claimant and against the claimant. If a clerk received from the Postmaster-G-eneral the appointment of superintendent of delivery in the manner contemplated by the statute and served as such and performed the duties of the office, the defendants can not show, as they have attempted to show, by evidence aliunde the record that the Department did not intend to make the appointment. Conversely, where a clerk was not designated or appointed superintendent of delivery, he can not claim the salary of that office as a matter of legal right by showing that he performed the service of a superintendent of delivery. Whether the Postmaster-General (as is contended by the claimant’s counsel) intended to evade the statute by procuring the services of superintendents of delivery and refusing them appointments as such is a question between the Postmaster-General and Congress, which this court can not determine. The legal right of an officer to the salary of an office depends upon his being de jure an officer holding or entitled to hold the office. {Romero’s Case, 24 C. Ols. R., 331.)
The judgment of the court is that the claimant recover $366.60.